FLORA B. CASSAS,

*Plaintiff and Appellant,*

vs.

RAY R. CASSAS,

*Defendant and Respondent.*

FLORA B. CASSAS,

*Plaintiff and Appellant,*

vs.

RAY R. CASSAS,

*Defendant and Respondent.*

(Nos. 2630 and 2631; November 16th, 1954; 276 Pac. (2d) 456)

For the plaintiff and appellant the causes were submitted upon the brief and also oral argument of W. A. Muir of Rock Springs, Wyoming.

For the defendant and respondent the causes were submitted upon the brief and also oral argument of Albert E. Nelson of Rock Springs, Wyoming.

## OPINION

BLUME, Chief Justice.

To set out the voluminous pleadings herein at length would subserve no good purpose, so we shall mention merely the gist of them, incidentally referring to them again in the further discussion of this case.

On June 10, 1952, the plaintiff Flora B. Cassas brought an action for a declaratory judgment against Ray R. Cassas, former husband of the plaintiff, asking that she be declared to be the owner of one-half interest in Lot Nine in Block Eighteen in the Central Coal & Coke Company's Second Addition to the town, now city of Rock Springs, Wyoming, together with the improvements thereon. The defendant denying that plaintiff had any interest therein also pleaded the statute of limitations and the statute of frauds and asked for an accounting of rent collected by plaintiff.

On November 17, 1952, plaintiff brought a second action against the defendant. An amended petition was filed on February 28, 1953, in which plaintiff claimed judgment against the defendant for the sum of $7,300, consisting of the following items: $4,550

at the rate of $50 per month for goods bought for the two minor children of plaintiff and defendant, Constance and Carma Cassas; and $2,750 at the rate of $50 per month for taking care of the two minor children, keeping house for them and for collecting rent and keeping the improvements on the above property in repair. An attachment was issued in connection with this cause of action. Defendant denied liability for these items and alleged that in 1948 defendant went to Arizona because of ill health; that when he left he provided for his children with a home and adequate rentals to support them; that plaintiff, without his knowledge and consent moved into his home and appropriated the rentals. The two actions were consolidated for trial| Judgment in each action was entered in favor of defendant and plaintiff has appealed. We shall consider both actions in this opinion in view of the fact that some of the evidence bears on both cases.

The cases were tried to a jury. The jury returned a general verdict for the defendant in both cases and also answered certain special interrogatories submitted to them. Thereupon the court entered judgments for the defendant, and dissolved the attachment theretofore issued. From those judgments, plaintiff has appealed. Before setting out the special interrogatories and the answers thereto, it will be well to give a brief but general picture of the facts as disclosed by the evidence, in order that these special interrogatories and answers thereto may be better understood.

Plaintiff and defendant were married in 1917 and moved to Rock Springs in this state where defendant obtained a position with the Superior Lumber Company. Six children were born of this union, all girls, one of whome died about 1939. All the others were married at the time of the trial in this case, except one, the youngest one then being about 17 years of age.

One of the children who is married lives in California. The other four children live in Rock Springs ,and all of them testified on behalf of the defendant. In 1925, a contract was entered into for the purchase of the lot above mentioned. The contract apparently was made between defendant and Mr. Facinelli. The plaintiff had no property of her own, and the lot was paid for out of the earnings of the defendant, although plaintiff testified that part of it—say half of it—was paid for by her individually out of the savings of the money which defendant gave her for the house. A deed to the property was taken in the name of the defendant. It was not recorded until 1937. Plaintiff testified that she always thought that part of the property was hers, although she admitted that at various times, when the parties apparently had some trouble, defendant told her that she did not own the property. In 1926, the parties built a three-room house on the lot in question. Work thereon was done by both plaintiff and defendant and some neighbors and friends. In 1935, the parties commenced the erection of a seven-room house on the same lot. Work thereon was done by both plaintiff and defendant and neighbors, plaintiff helping in shingling, lathing, painting and other such work. To pay for the lumber, and other items, the parties borrowed the sum of $4,100 from the Sweetwater Savings and Loan Association, giving a note and a mortgage on the property which were signed by both plaintiff and defendant. The payments on the note and the mortgage were apparently made, in the main, from rental of the small house, the amount thereof was, by 1948, reduced to $3,016.40, and between 1948 to 1951 to the further sum of $2,584.72.

On December 10, 1937, the defendant obtained a divorce from the plaintiff, after personal service was had on the plaintiff. The daughter Lola was at that

time 17 years of age; June was 11 years old; Constance was 3½ years old and Carma was 1½ years old. No reference in the decree was made to the property herein involved. The divorce was uncontested. Plaintiff testified that she did not contest the divorce because defendant threatened to kill her if she did. Lola McQuillan, daughter of the parties, however testified that she heard no threats made by defendant; that plaintiff and defendant had quarreled for some time before the divorce was granted because the plaintiff was keeping company with one Lawrence Moss (this was denied by plaintiff) ; that in May of 1937, plaintiff left her home; that plaintiff told her that she was leaving and would not come back, and to the knowledge of the witness, her father did not tell plaintiff to leave; that a month after plaintiff left she came to the house but did not enter it; that in 1938 she came to the house staying perhaps only an hour; that in 1939 a sister died and plaintiff stayed two nights, and left again; that for two or three years, they (the family) did not know where plaintiff was. Apparently, however, plaintiff was at Rock Springs or thereabouts till 1944, when she went to Vancouver, Washington, working in the shipyards. In 1945, she went to Green River in this state, and worked there until April 1, 1948. During this time she would often come to Rock Springs, go to the home of her eldest daughter and there see her minor children, who, it seems, did not know their mother until that time. On April 1, 1948, she returned to Rock Springs and from then on lived in the premises in controversy, her husband then being in Arizona where he went for his health. She then took charge of the premises, collected rent (apparently up to July 1951) in the sum of $1,932.50, applied the sum of $1,546.26 on the loan against the property, and testified that she paid out $870,56 for repairs on the house, leaving a balance due her of $484.32.

After divorcing plaintiff, defendant continued to live in the premises in controversy and support of his family. In March of 1945, he became crippled with arthritis and was compelled to quit work. He went to Thermopolis to take baths for five or six weeks; came back to Rock Springs and was hospitalized there for a number of months; then went to the Veteran's Hospital at Cheyenne where he was for a year up to October 1946, and then went to Arizona on the advice of physicians because he was so crippled that he could not get out of bed, keeping his "possessions", however, at his home in Rock Springs. He received a veteran's pension of $60 per month. He sent part of that from time to time to some of the children, but they finally refused to accept any more on account of the fact that he needed it more than they. When he went to Arizona, he left his daughter June in charge of the premises; she collected the rent, made payments on the mortgage and used the remainder, with much of her own money, to support the two minor children. All the older daughters looked after the younger ones. Defendant had told his daughters that their mother was not to return to the house. The minor children were Constance and Carma Cassas. Plaintiff contributed some amount to their support after 1948, but the evidence indicates that most of their support came from their older sisters.

The interrogatories submitted to the jury by the plaintiff in the first of the above actions, together with the answers thereto, are as follows:

"1. Did the plaintiff and defendant, Flora B. Cassas, and Ray R. Cassas, as husband and wife, on or about July 14, 1925, purchase from Victor J. Facinelli of Rock Springs, Wyoming, Lot Numbered Nine (9) in Block Numbered Eighteen (18), in the Central Coal and Coke Company's Second Addition to the Town (now City) of Rock Springs, Sweetwater County,

Wyoming, notwithstanding the deed of conveyance contained the name only of defendant, Ray R. Cassas, as grantee?

"Answer  No.

"2. Did the plaintiff and defendant both contribute the sum of Two Hundred ($200.00) Dollars, from time to time, and pay the same to Victor J. Facinelli, as the purchase price of said Lot Numbered Nine (9) in Block Numbered Eighteen (18), in the Central Coal and Coke Company's Second Addition to the Town (now City) of Rock Springs, Sweetwater County, Wyoming?

"Answer  No.

"3. Do you find from the evidence in this case that it was understood and agreed by and between the plaintiff, Flora B. Cassas, and the defendant, Ray R. Cassas, that they would purchase said Lot Numbered Nine (9) in Block Numbered Eighteen (18), as husband and wife, for the purpose of building a home thereon for themselves and their family?

"Answer  Yes.

"4. Do you find from the evidence in this case that prior to the purchase of said lot or real property that the plaintiff and defendant agreed and intended that said Lot Numbered Nine (9) in Block Numbered Eighteen (18), was to be owned by both of them and that they would own said lot or real property as joint tenants?

"Answer  No.

"5. Do you find from the evidence, the title to said lot or real property should have been vested in their joint names, and that defendant, Ray R. Cassas, without the knowledge, consent or approval of the plaintiff, Flora B. Cassas, had said lot or real property conveyed to himself individually, instead of being conveyed to Ray R. Cassas and Flora B. Cassas, and against the interests of the plaintiff, Flora B. Cassas?

"Answer  No.

"6. Did the defendant, Ray R. Cassas, in violation of his trust with plaintiff, and in violation of their agree-

ment, have said lot or real property conveyed to himself?

"Answer   No.

"7. Was it understood and agreed that said real property was being purchased by said parties, for the purpose of building a home thereon?

"Answer   Yes.

"8. Do you find from the evidence that defendant, Ray R. Cassas, failed and neglected to convey an undivided one-half interest in said real property to the plaintiff, Flora B. Cassas?

"Answer   No.

"9. Is the plaintiff the owner of an undivided one-half interest in said lot and real property and does she own a homestead right in said property?

"Answer   No.

"10. From the evidence do you find, that the plaintiff, Flora B .Cassas, relied upon the honesty and integrity of the defendant, Ray R. Cassas, and believed that said real property had been conveyed to plaintiff and defendant, as husband and wife?

"Answer   Yes.

"11. From the evidence do you find that the plaintiff, Flora B. Cassas, did not learn or discover that the defendant, Ray R. Cassas, had actually taken the legal title to said lot or real property, in his own name, until on or about the 31st day of July, A. D. 1951?

"Answer   No.

"12. Did the plaintiff, Flora B. Cassas, and the defendant, Ray R. Cassas, together and jointly build and construct, at their joint expense and with their own work, a small house consisting of three rooms and a larger house consisting of seven rooms, and live therein as husband and wife with their family, after said Lot Numbered Nine (9) in Block Numbered Eighteen (18) in the Central Coal and Coke Company's Second Addition to the Town (now City) of Rock Springs,

Sweetwater County, Wyoming, was purchased by them?

"Answer Yes.

"13. Did plaintiff and defendant thereafter occupy said small house and said large house, with their family as a home until on or about September 1, 1937?

"Answer Yes.

"14. Did the plaintiff, Flora B. Casses, and the defendant, Ray R. Cassas, borrow from the Sweetwater Federal Savings and Loan Association the sum of Four Thousand One Hundred ($4,100) Dollars, and make, sign and deliver a promissory note therefor and make, sign and deliver a mortgage deed, whereby they mortgaged said real property, as husband and wife, and as the owners of said real property to secure the payment of said indebtedness?

"Answer Yes.

"15. Was the sum of Four Thousand One Hundred ($4,100.00) Dollars borrowed by plaintiff and defendant from the Sweetwater Federal Savings and Loan Association, by said plaintiff and defendant, used by them to pay for lumber, materials, supplies and merchandise, which had been bought from the Superior Lumber Company to build said houses on said lot?

"Answer Yes.

"16. Did the parties, plaintiff and defendant, purchase said lot and build said houses thereon, together and jointly and as husband and wife, and was it understood and agreed by them that each of them should own an undivided one-half interest therein?

"Answer No.

"17. Did the defendant, Ray R. Cassas, leave the State of Wyoming, and move out of said real property in 1945, and has the plaintiff collected certain rents and applied said rents toward the payment of said note and mortgage deed since the month of April, A. D. 1948?

"Answer Yes.

"18. Has the plaintiff applied said rents collected by her since April, 1948, toward the payment of said promissory note and mortgage deed and has she paid the taxes, utilities, repairs, materials, paints, insurance premiums and garbage disposal fees and has she used, from her own funds and money in addition to the rents collected to do so?

"Answer    No."

The interrogatories submitted to the jury by defendant in that action, together with the answers thereto, are as follows:

"1.  Q. Was Lot Number Nine (9) in Block Number Enghteen (18) in the Central Coal &Coke Company's Second Addition to the Town (now City) of Rock Springs, Sweetwater County, County, Wyoming, paid for from the earnings of the Defendant Ray R. Cassas?

    A. Yes.

"2.  Q Did Plaintiff Flora B. Cassas and Defendant Ray R. Cassas enter into any written agreement whereby Defendant agreed to have the title to said premises vested in the joint names of Plaintiff and Defendant?

    A. No.

"3.  Q. Did Defendant Ray R. Cassas at any time prior to September, 1937, notify Plaintiff Flora B. Cassas that she had no interest in and to said real property?

    A. Yes.

"4.  Q. Did Plaintiff Flora B. Cassas occupy and make her residence at said premises during any time between September, 1937, and April 1, 1948?

    A. No.
        *    *    *    *

"6.  Q. Exclusive of the money borrowed from the Sweetwater Federal Savings and Loan Association, did Plaintiff Flora B. Cassas use any money received from her personal earnings

or private estate to pay for or improve said premises prior to September, 1937?

A. No.
* * * *

"8. Q. Did the Defendant Ray R. Cassas ever exclude Plaintiff Flora B. Cassas from occupying said premises?

A. Yes.

"9. Q. If the above answer is "Yes", did Defendant Ray R. Cassas exclude Plaintiff Flora B. Cassas from occupying said premises between the dates of September, 1937 and April 1, 1948?

A. Yes.

"10. Q. Did Defendant Ray R. Cassas ever promise in writing to deed Plaintiff a one-half interest in said real property, or to have said real property conveyed to himself and Plaintiff jointly?

A. No.

"11. Q. Did Defendant Ray R. Cassas ever abandon said real property? ("Abandon" meaning leaving and removing his belongings therefrom with no intention of returning or of claiming any further interest in and to said real property.)

A. No."

I.

As heretofore stated, the contract and the deed for the lot in question herein was made and taken in the name of the defendant, the husband. Plaintiff testified that she paid about one half of the contract price out of her savings of the money which her husband gave her for household expenses. Counsel for plaintiff and counsel for the defendant are equally confident that the money so paid by plaintiff was money paid by their respective client, counsel for plaintiff claiming that a resulting trust arose in favor of plaintiff.

In fact counsel for plaintiff states in his brief that when defendant pleaded the statute of limitations and the statute of frauds, he admitted the existence of a trust. He cites no cases. There is no merit in that contention. A party may plead as many defenses as he has, even though inconsistent. The jury, by their general verdict, evidently took the view of counsel for the defendant, and this view was approved by the trial court. We have here a rather delicate question before us and no case in point has been cited. Counsel for plaintff cites us to some cases from states that have the community property law. Our statutes, in addition to the married woman's legislation, make fairly good provision for a wife. In case her husband predeceases her, she gets a definite portion of his estate, whether he makes a will or dies intestate. If there are marital troubles, and they live apart, the statute makes provisions for alimony. In case there is a divorce, the court has power to divide and distribute the property. But these provisions do not go to the extent of the community property laws. We have here the common law except in so far as modified by statute. The rule at common law is stated in Blackman v. Blackman, 45 Ariz. 374, 43 P. (2d) 1011, 1014, as follows: "Any personal property acquired during coverture by the exertions of either husband or wife * * * was the husband's separate property, and at his absolute disposition, either by grant or by will. Such was also true of real estate bought during coverture when the title was taken in the name of the husband." In 41 C.J.S. § 18, p. 415, it is stated: "During the continuance of the marriage the wife has no right to the personal property of the husband, or any portion of the proceeds and profits." In 41 C.J.S. § 148, p. 619, it is stated: "A gift of personal property from a husband to the wife is void at common law, * * * * ."

These rules of the common law have been modified by married-women acts. Section 50-201, Wyoming

Compiled Statutes, 1945, provides: "All the property both real and personal, belonging to any married woman as her sole and separate property, or which any woman hereafter married owns at the time of her marriage, or which any married woman during coverture acquires in good faith **from any person whomsoever** * * * * shall, notwithstanding her marriage, be and remain during coverture her sole and separate property * * * *." (Italics supplied) She may accordingly receive a gift from her husband, contrary to the rule of common law. Was the money here involved a gift within the contemplation of the statute and acquired by her in good faith? It was originally, his. It does not appear that he parted with the unqualified ownership thereof. It was given to her for household expenses, as she testified. He, accordingly, gave it to her upon condition. She had no right to divert it to her separate use without his consent. It was not a gift in the ordinary sense of that term. We need not decide as to what should be the rule applicable when a man gives money to his wife for household expenses and she uses some of the money to acquire some independent property for herself with his consent. But when she uses part of the money, given her conditionally, and with it pays for part of the purchase price of property taken in the name of the husband, another question arises. We hardly think that she should be permitted to act with the money given her as above mentioned against the interests of her husband. If it can be said to be her property, then payment in the manner above mentioned would be rather a gift on her part to her husband. We think, accordingly, that we cannot take a view opposite to that taken by the jury and the trial court.

We might mention the fact that appellant introduced a great deal of testimony to the effect that plaintiff

helped in painting and shingling the houses and in like work, apparently on the theory that such work gave her a vested interest in the property. Plaintiff has apparently abandoned that theory, for we do not find any such a claim made in the brief of her counsel. That the theory is not valid see 41 C.J.S. 413 and 742. Nor can the fact that plaintiff signed the note and mortgage mentioned deprive the defendant of his property. Plaintiff paid nothing on the note and mortgage.

II.

The court in the divorce proceeding made no disposition of the property in controversy here. Counsel for plaintiff and appellant contends that the court should reopen the question relating to the property. And we are cited to Rush v. Rush, 58 Wyo. 406, 133 P. (2d) 366, where we held that this may be done in case of fraud. Counsel is candid enough in not specifically claiming any fraud, but thinks that a like rule should be applied in this case by reason of the testimony of the plaintiff that she did not appear in the divorce proceedings by reason of threats of her husband to kill her if she resisted the divorce. But the jury evidently disbelieved that testimony. We have already set out the testimony pertaining to this matter, and we think that the jury, and the trial court were fully justified in not accepting plaintiff's testimony as true. It would seem accordingly that the rule stated in Roberts v. Fagan, 76 Kan. 536, 92 P. 559, is the rule applicable herein. It was stated in that case: "When parties have been divorced by a court having jurisdiction thereof, and no proceedings have been taken to vacate or modify the decree by appeal until the statutory time therefor has expired, all the rights which either had to the property of the other by reason of the marriage relation will be extinguished by such decree." See to the same effect Fusselman v. Fusselman, 122 Kan. 515,

253 P. 411, and other cases cited therein. See also Harden v. Harden, 182, Okla. 364, 77 P. (2d) 721. Plaintiff contended that she had a homestead right in the property. But that was extinguished when the divorce was granted and she left the property. It is stated in 27 C.J.S. § 180, p. 837, as follows: "An absolute divorce ordinarily terminates all property rights and interests, not actually vested, of divorced persons in property of each other, which are dependent on the marriage. Accordingly, unless the court granting the decree is without jurisdiction, inchoate rights of the wife in the husband's property are usually cut off, * * * *. Also, if the title to the homestead is in the husband and no disposition is made thereof, it remains the property of the husband as the head of the family, discharged of all rights of the wife."

## III.

What we have said is independent of the question of the statute of limitations, which provides that title may be acquired by adverse possession for the period of ten years. It is contended that defendant by reason of going to Arizona interrupted that period. We find no merit in that. He went to Arizona by reason of his crippled condition, leaving his personal possessions in the house, and leaving his daughter or daughters in charge, and forbidding the plaintff to come into it. We think that the defendant had the exclusive possession of the property for ten years, claiming it adversely against the plaintiff. And we might incidentally mention that counsel for plaintiff claims that adverse possession does not run in case of a trust. But the evidence of plaintiff herself shows that long before the divorce decree was entered, defendant informed her that she had no rights in the property. That clearly was a repudiation of the trust, if that existed, and

there is no reason that the statute of limitations did not apply. See 54 C.J.S. 153 .

Considerable reference is made in the brief of counsel for plaintiff to constructive trusts. We fail to see the relevancy of that. None of the elements of such a trust are present in the case at bar so far as we can see.

## IV.

Defendant attached interrogatories to his answer. Plaintiff demurred to interrogatories 1 to 7 as not pertinent and relevant to the pleadings. The court overruled the demurrer, and the interrogatories were thereupon answered by the plaintiff. It is contended that the overruling of the demurrer is reversible error. The interrogatories above mentioned asked the amount of the private estate of plaintiff at the time and after her marriage, and whether or not she received any property by inheritance. Questions of the same nature were asked the plaintiff on cross-examination, to which the plaintiff objected, but the objection was overruled. That, too, is assigned as error. We find no merit in these objections. Plaintiff in her petition alleged that she and her husband bought the property in question jointly and that she contributed thereto. So the defendant had the right to find out where she got the money to pay. True when she testified on direct examination she explained that she got the money from her husband as already heretofore mentioned. Still, in view of her allegations in the petition, we cannot say that it was error to ask of her on cross-examination the source from which she might have obtained the money to pay for the property. In any event, we are unable to see wherein she was prejudiced. The jury cannot have been misled by the testimony.

## V.

It is contended by plaintiff that some of the interrogatories submitted to the jury were irrelevant and that the answers to the special interrogatories are inconsistent with the general verdict. So plaintiff filed a motion for judgment notwithstanding the verdict, which was overruled by the court, and this is assigned as error. We have set out the interrogatories and answers in detail, and we have examined them with some care. If it is true that some were irrelevant, the plaintiff could not have been prejudiced, nor do we find that plaintiff made any objection thereto. The trial court did not think these special findings were inconsistent with the general verdict, and we think that the trial court was right. It would subserve no good purpose to go over the various objections mentioned in counsel's brief. We shall mention just two. Interrogatory 3 submitted by plaintiff asked whether it was understood by the parties, as **husband and wife,** that they would purchase the lot in question for the purpose of building a home thereon for themselves and their family. The answer was "Yes". But the jury explained that: "We interpret the phrase 'husband and wife' not to mean coowners of said property." The jury thus indicated that whatever agreement was made did not relate to joint ownership. Interrogatory 7 submitted by plaintiff was as follows: "Was it understood and agreed that said real property was being purchased by said parties for the purpose of building a home thereon?" The answer was "Yes". That undoubtedly was correct, but does not show that plaintiff paid any money for the lot or that she was to be a coowner of the property.

## VI. Second Case.

What we have heretofore said relates in the main

to the first action brought herein, in which plaintiff sought to recover a one-half interest in the property in controversy. In the second action plaintiff seeks to recover a judgment from the defendant in the sum of $7,300 on account of necessities furnished her minor children. She also seeks to recover money for personally taking care of the children—aside from what money she furnished—a feature which seldom, so far as we have discovered, has been asked in any action. Special interrogatories were submitted to, and answered by the jury. These are as follows:

"1. Q. Did the defendant Ray R. Cassas, or anyone else ever request Plaintiff Flora B. Cassas to support or contribute to the support of, Constance Cassas and Carma Cassas, minor children of Plaintiff and Defendant?
A. No.

"2. Q. Did Plaintiff Flora B. Cassas contribute anything to the support of said Constance Cassas and Carma Cassas?
A. Yes.

"3. Q. If the answer to the above question is "Yes", state how much, what it is for, and when.
A. Can't agree.

"4. Q. If the Plaintiff did contribute to the support of said minor children, did she intend such contribution as a gift?
A. Yes.

"5. Q. Were said minor children being adequately supported when Plaintiff Flora B. Cassas took up her residence with them in 1948?
A. Yes.

"6. Q. Did Defendant Ray R. Cassas provide said minor children with a home and with adequate means of support?
A. No."

It may be noted that the last answer is not strictly correct in view of the fact that the defendant did in fact furnish the children with a home—it was his. Furthermore, the rental, too, was used for their benefit.

The cases are numerous in which a mother, divorced from her husband, has brought an action against the former husband for the recovery of money expended by her in support of minor children. The cases are collected in 27 C.J.S. 1197 and subsequent pages, 19 C.J. 353 and subsequent pages, and see 2 Nelson on Divorce and Annulment, 2nd Ed., § 15.57 and subsequent sections, and 17 Am. Jur. 527 to 530. The courts are at variance in many respects, and many cases depend on the peculiar facts thereof. Particularly in view of the cases on which counsel for plaintiff relies, it is best that we take at least a glimpse at the main rules governing the question as to whether a former wife may recover money as she seeks to do in this case.

A partial annotation on the subject before us is contained in 15 A.L.R. 569 and 81 A.L.R. 887. For later cases see Decennial and General Digests under Divorce, §§ 323 and 324. It is stated in these annotations when the custody of a minor child has been awarded to the mother, but no provision is made for its support, the majority rule is that the father is liable for the support of the child and that the mother may recover the money expended thereon on the theory that the duty to support offspring is primarily on the father. Most of these cases cited by counsel for plaintiff present a situation such as that. These annotations state that there is a minority rule, holding that in such case the father is not liable for the support of the minor child, or at least not for past support. Cases are cited from California, Indiana, Maine, New York,

Rhode Island and South Carolina. To these cases should be added cases from Iowa, where the so-called minority rule seems to prevail. Thus it was said in Freet v. Holdorf 205 Iowa 1081, 216 N.W. 619, 620: "Plaintiff and the defendant are divorced from each other, and the erstwhile wife cannot now sue the former husband to recover moneys expended by her on behalf of herself or child. Stamp v. Stamp, 196 Iowa 1133, 196 N.W. 1. The legal duty to support children is cast equally upon both parents, and when such duty is performed by the wife she cannot recover therefor in an action against her husband." The so-called minority rule, too, was held to be the rule in Finch v. Finch, 22 Conn. 411. Subsequently a statute was passed, and under that statute it was held in Welch's Appeal from Probate, 43 Conn. 342, that the husband should contribute a fair proportion toward the support of the children. See also Castagnola v. Fatool, 136 Conn. 462, 72 A. (2d) 479. The so-called minority rule also seems to be substantially in effect in Kentucky. See Christie v. Christie, 223 Ky. 539, 4 S.W. (2d) 375, wherein it was held that the wife may apply to the court in the divorce proceeding and have the decree modified so as to compel the husband to contribute to the support of the minor children, and if she is able to serve notice upon the former husband she cannot recover a judgment for past support. And in Parks v. Parks, 209 Ky. 127, 272 S.W. 419, the court held that when the mother has the custody of minor children, she is primarily liable for their support. See also Wilson v. Wilson, 271 Ky. 631, 112 S.W. (2d) 980. In Broman v. Byrne, 322 Mass. 578, 78 N. E. (2d) 616, 617, the court stated: "In the present case, after the custody of the child was given by decree to the petitioner (mother), in the absence of any order of court the respondent (former husband) was no longer liable for its support. Brow v. Brighton, 136 Mass. 187, 189; Ryder v. Per-

kins, 219 Mass. 525, 107 N.E. 387." See also Bondies v. Bondies, 40 Okl. 164, 136 P. 1089.

In the Pennsylvania case of Cirucci v. Brasili, (1951), 33 West 23, 76 Pa. D.& C. 366, it is held: The mere fact that a mother has maintained her own children raises in law no obligation to pay. The presumption is that she did it gratuitously and in the absence of an express or implied promise to pay her for maintaining them, she is not entitled to be reimbursed therefor from the father. That seems to have been the rule in Pennsylvania from an early day. Fitler v. Fitler, 33 Pa. 50. To the same effect see Thompson v. Mueller, 28 Ohio App. 51, 161 N.E. 291; Ramsey v. Ramsey, 121 Ind. 215, 23 N.E. 69, 6 L.R.A. 682, containing a full discussion. See also 67 C.J.S. 701. We might say incidentally that counsel for the plaintiff contends that the claim of gratuitous service cannot be made under a general denial, but the family relationship must be pleaded as a special defense, citing 58 Am. Jur. 557, 558. But the rule does not apply here, for the plain-tiff's petition itself discloses it.

In the case at bar the defendant obtained a divorce from plaintiff on account of the latter's fault. One of the leading cases on that subject is the case of Fulton v. Fulton, 52 Ohio St. 229, 39 N.E. 729, 732, 29 L.R.A. 678. A divorce was obtained by the husband on account of the fault of the wife. The custody of the minor children was awarded to the wife without provision as to who should maintain them. Holding that the wife could not recover any money expended on behalf of the children, and that after the divorce she was like a stranger to her former husband, the court said in part: "And although the separation and divorce were caused by the misconduct of the mother, it may nevertheless be true that the obligation of the father to reasonably provide for his children will follow them into the custody of

the delinquent mother, when circumstances require them to be placed in her custody. If, however, under such circumstances, it does so follow them, the reason and limit of this obligation of the father should be found in the necessities of the children. As to them, the natural obligation of protection, nurture and maintenance, presses with equal force upon the parents. By the divorce, a vinculo, the mother is as completely absolved from the marital relation as she would be by death, and if, in the course of the proceeding which ends in an absolute divorce, the minor children are put under her control, by her procurement or in response to her wishes, her direct obligation towards them, so long as she retains them, would seem to be founded upon as substantial considerations as if she were a widow. Their daily wants must be satisfied. Constant supervision may be necessary. Can their divorced mother, who has received them into her custody, abandon them in the one case and not in the other? We think not. By receiving them into her custody she should be held, as to them, to assume the obligations incident to that custody. If, under these circumstances, where her own misconduct has destroyed the family relation, and deprived the father of the custody and society of his children, she has in fact maintained her children, she has no claim, legal or moral, to demand reimbursement from the father. She has simply discharged a duty cast upon her by the plainest principles of natural justice, for the reason that the necessity for it arose from her own misconduct."

In the case of Kimmel v. Dorshimer, 19 Ohio App. 257, the syllabus is as follows: "A wife who has been divorced for her own misconduct and who voluntarily assumes the custody and support of her minor child cannot recover of her former husband for such expenditures in the absence of an express contract, and in a

case where the court had awarded the custody of the child to the father and made no order regarding maintenance." See also Fitler v. Fitler, supra. The contrary, however, was held in Kelly v. Kelly, 329 Mo. 992, 47 S.W. (2d) 762, 81 A.L.R. 875.

The holding that when a father is not at fault, a mother who has the custody of a child cannot recover for past support cannot be said to be without merit. Of course we must bear in mind that in a question involving the support of minor children, the paramount consideration is the future welfare of such children. They are not parties to any divorce proceedings between the parents, and a father should support his offspring at least when the necessities of the children require it. So it is held that in any event, if the mother having the custody of such offspring cannot support them the father should do so in whole or in part. See 17 Am. Jur. 529; Williams v. West, Ky, 258 S. W. (2d) 468; Dunn v. Dunn, Tex.Civ.App., 217 S.W. (2d) 124. Thus it is provided by our statute that a decree of divorce may be modified to make proper provision for minor children. See § 3-5919 W.C.S. 1945. And it is held in the late case of Dimon v. Dimon, 40 Cal. (2d) 516, 254 P. (2) 528, that a wife may bring an independent action against her former husband to compel him to contribute to the future support of minor children, but cannot obtain a judgment for money expended for the support in the past. See also McDaniel v. Rucker, 150 Ohio St. 261, 80 N.E. (2d) 849. But see Fuller v. Fuller, 169 Tenn. 586, 89 S.W. (2d) 762. And in the comparatively late New York case of Swanton v. Curley, 273 N.Y. 325, 7 N.E. (2d) 250, 252, the court stated: "The rule is that an action brought by a divorced wife against her former husband to recover money spent for their child's maintenance is brought for the benfit of the child (Laumeier v. Laumeier, 237 N.Y. 357, 364, 143

N.E. 219, 32 A.L.R. 654,) but, when a child has been adequately supported by one who maintained it without expectation of reimbursement, certainly a third party, even though she be the mother, can have no standing in an action brought by her."

In 27 C.J.S. 1204 are stated two rules which seem to come the closest in determining what should be the holding in this case. The first of these rules is stated thus: "On the other hand, it has been held that where the wife takes a child away from the father, to whom the custody has been awarded, without an order for its maintenance, she cannot recover from the father for support furnished the child while in her custody." This rule is supported by Nelson v. Nelson, 146 Ark 362, 225 S.W. 619; Wills v. Baker, 240 Mo. App. 705, 214 S.W. (2d) 748; Assman v. Assman, 192 Mo. App. 678, 179 S.W. 957; White v. White, 138 Conn. 1, 81 A. (2d) 450, 453, 454. In the last mentioned case a judgment was sought by the mother of a child for past support. The court stated among other things: "Ordinarily, therefore, a parent's obligation to support is suspended during such time as he is wrongfully deprived of the custody of his child. * * * * Where a child has been removed from his father's home by his mother, immunity from liability for support arises in the event that such removal was wrongful * * * * Under the well-established principles set forth above, in order to impose liability upon the defendant in this case it must appear either that there has been a valid judgment by which the defendant has been deprived of the right to custody of the child or that for some other reason the removal of the child from his custody was not wrongful. The burden of proof on these matters is upon the plaintiff. Mihalcoe v. Holub, 130 Va. 425, 430, 107 S.E. 704."

The second rule above mentioned is as follows: "If the father becomes helpless and unable to furnish such support, the duty to support the children falls upon the mother notwithstanding the decree of divorce gave their custody to the father." This rule is fully supported by Haugen v. Swanson, 222 Minn. 203, 23 N.W. (2d) 535, denying a judgment for past support. In re Weber's Estate, 168 Misc. 757, 6 N.Y.S. (2d) 417; and see West v. West, 114 Okla. 279, 246 P. 599; Josey v. Josey, 114 Okl. 224, 245 P. 844.

Let us examine the facts in this case in the light of these rules. Defendant left for Arizona, leaving two of his adult daughters, particularly June, in charge of the two houses and in charge of the minor children. June collected the rents, paid installments on the mortgage and used the remainder of the money for the support of the minor children, adding much money of her own, as was true also of the other adult daughters. As far as we can tell from the record, the minor children were not alone fully supported, until April 1, 1948, as the jury found, but were fully protected, the adult or older daughters acting in place of their father, and as his agents or semi-agents. They needed no guardian or protector other than these adult or older daughters as fully shown by the testimony of the daughters, Lola and June. While defendant was well, he fully performed his duty as father, so far as the record shows, but was compelled on account of his crippled condition to go to Arizona, but even then fully performed his duty as father through his agents, his adult or older daughters, and as far as we can see, he acted wisely in choosing them as his agents or semi-agents. The plaintiff, taking advantage of the crippled condition of the defendant, and of his absence in Arizona, invaded the latter's premises without defendant's knowledge or consent, and against his express wishes.

She was an intruder and had no more right therein than a complete stranger. She took the custody of the minor children away from the father, and his agents or semi-agents, as effectively as if she had moved them away to another place. Whatever she did, she did voluntarily and against the defendant's wishes. She herself testified that she never expected repayment of any money she expended on the children. Under the first of the above mentioned rules, she is not entitled to receive remuneration from the defendant for what she did.

And the same result should follow under the second of the above rules. Aside from the rent, defendant received the small sum of $60 per month as a veteran's pension. Even so, he sent part of that pension to his minor children, until they refused to receive any more on the ground that he needed it more than they did. He must have practiced an economy, which courts would ordinarily at least refuse to compel him to practice. When the plaintiff collected the rents from the houses, she contributed to the disablement of the defendant to properly support his minor children. She did this unlawfully and should not be able to profit by her unlawful act. In an annotation in 121 A.L.R. 190, dealing with the question as to whether or not a parent is entitled to be reimbursed from the property of minors by reason of the support furnished by a parent, it is stated: "In general, the criterion for determining whether the parent should be reimbursed for expenditures is whether the parent would have been given an allowance for such support upon an application therefor made in advance, * * * ." We can see no reason why that rule should not be applied here. If plaintiff had applied to the court for a modification of the divorce decree to allow her a sum of money out of his small pension for the support of her children

after April 1, 1948, we are quite certain that she would not have been successful. Neither should she be successful in this case. While plaintiff apparently has little property, she is at least able to work, while defendant is not. In so far as he was not able to support his minor children—and he did all that he could—it was plaintiff's duty to support them.

We cannot find a reversible error in the record and so the judgment in both cases herein is affirmed.

Affirmed.

RINER, J., AND HARNSBERGER, J. concur.